**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| THI MILLER, individually and on behalf of all others similarly situated, | |
| *Plaintiff,* | Case No. 12-cv-04961 |
| v. | [Hon. Amy J. St. Eve] |
| RED BULL NORTH AMERICA, INC., a California corporation, | |
| *Defendant.* | |

**PLAINTIFF'S *CORRECTED* UNOPPOSED MOTION FOR AWARD OF**
**ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

Respectfully submitted by:

Jay Edelson
Rafey S. Balabanian
Ari J. Scharg
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
jedelson@edelson.com
rbalabanian@edelson.com
ascharg@edelson.com

*Attorneys for Plaintiff and the Class*

## TABLE OF CONTENTS

I.     **INTRODUCTION** ...............................................................................................1

II.    **BACKGROUND** ................................................................................................3

     **A.**    **Litigation and Mediation**................................................................3

     **B.**    **Settlement Terms** ............................................................................5

III.    **ARGUMENT** ...................................................................................................6

     **A.**    **Class Counsel's Attorneys' Fees and Expenses Should be Approved Because They Are In Line With the Market Rate.** ...........................6

          **1.**    *Attorneys' Fees Should be Calculated by the Percentage-of-the-Fund Method.* ...................................................................................7

          **2.**    *The Market Rate in Similar Cases is 30-33% and Thus Class Counsel's 21% Fee Request is Reasonable* ..............................8

          **3.**    *The Fee Agreement Between Plaintiff and Class Counsel Supports the Requested Attorneys' Fees.* .............................................9

          **4.**    *The Risk of Nonpayment and Not Prevailing, Coupled with the Quality and Amount of Work, Adds Further Support to the Requested Fees.* ..............................................................10

     **B.**    **The Lodestar Approach Confirms the Reasonableness of a $1.275 Million Award.** .............................................................................11

     **C.**    **The Incentive Award is Reasonable and Should Be Approved** ......14

IV.    **CONCLUSION** ...............................................................................................16

## TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ..........................................................8

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Assess. Tech. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434 (7th Cir. 2004)...................7

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998) ....................................................11,15

*Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003) .........................................................12

*Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560 (7th Cir. 1994) ................................6, 7

*Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) ..........................................................8

*Gastineau v. Wright,* 592 F.3d 747 (7th Cir. 2010) ..................................................12, 14

*Harman v. Lyphomed, Inc.*, 945 F.2d 969 (7th Cir. 1991).......................................13, 14

*In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992).........................................7, 10

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ......................................6, 15

*In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011) ...................12, 13

*Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*,
     553 F.3d 487 (7th Cir. 2009) ...........................................................................12

*Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 2006).............................................................8

*Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399 (7th Cir. 2000)...............................7

*Skelton v. General Motors Corp.*, 860 F.2d 250 (7th Cir. 1988)..............................13, 14

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) ...................................................6, 7, 10

*Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005) ...............................................6

*Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399 (7th Cir.1999) ........................................13

*Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629 (7th Cir. 2011) ....................6

## UNITED STATES DISTRICT COURT CASES:

*Arthur v. Sallie Mae, Inc.*, No. C-10-198JLR (W.D. Wash. 2012) ...................................1

*CE Design Ltd. v. Cy's Crab House North, Inc.*, No. 07-c-5456 (N.D. Ill. 2007) ........................9

*Espinal v. Burger King Corp. et al*, No. 09-cv-20982 (S.D. Fla. 2009) ........................................9

*Gutierrez, et al. v. Barclays Group, et al.* No. 10-cv-1012 (S.D. Cal. 2012) .................................1

*Hinman v. M and M Rental Center, Inc.*, No. 06-cv-01156 (N.D. Ill. 2006) .................................9

*In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109 (D.N.J. 2002) .................................14

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
792 F.Supp.2d 1028 (N.D. Ill. 2011) .................................12

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 3:11-MD-02261 (S.D. Cal. 2013) ......................1

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ................................8

*In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) .........................................14

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
364 F. Supp. 2d 980 (D. Minn. Apr. 8, 2005)....................................14

*Kazemi v. Payless Shoesource, Inc.*, No. CV09-5142 (N.D. Cal. 2012) ........................................1

*Kramer v. Autobytel, Inc.,* No. 10-cv-02722 (N.D. Cal. 2010).................................11, 15

*Lozano v. Twentieth Century Fox*, No. 09-cv-6344 (N.D. Ill. 2011)...................................9, 11, 15

*Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002)....................................14

*McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806 (E.D. Wis. 2009).................7, 8

*Meyenburg v. Exxon Mobil Corp.*, 2006 WL 2191422 (S.D. Ill. July 31, 2006)...........................8

*Pavlik v. FDIC*, No. 10-c-816, 2011 WL 5184445 (N.D. Ill. Nov. 1, 2011)................................9

*Roberts v. Paypal, Inc.*, No. C 12-0622 PJH, 2013 WL 2384242 (N.D. Cal. May 30, 2013)...1, 11

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y. 1997)............................................14

*Rojas v. Career Educ. Corp.*, No. 10-cv-5260 (N.D. Ill. 2012)..............................................11, 15

*Satterfield v. Simon & Schuster, Inc.,* No. 07-16356 (N.D. Ill. 2007) ...........................................11

*Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560 (N.D. Ill. 2011) ............................................8, 12

*Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012) ..........11

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
    No. 03-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005)................................................14

*Teamsters Local Union No. 604 v. Inter-Rail Transport, Inc.*,
    No. 02-cv-1109 DRH, 2004 WL 768658 (S.D. Ill. Mar. 19, 2004)...................................8

*Weinstein v. 12 AIRIT2ME, Inc.*, No. 06-cv-00484 (N.D. Ill. 2008) ............................................15

*Williams v. Gen. Elec. Capital Auto Lease*,
    No. 94 C 7410, 1995 WL 765266 (N.D. Ill. Dec. 26, 1995) ........................................7, 11

## STATUTES:

Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* .......................................................1

## MISCELLANEOUS:

Newberg on Class Actions § 1.18 (3d Ed.1992) .......................................................................8

Richard Posner, Economic Analysis of Law (3d ed. 1986)........................................................13

Richard A. Posner, Economic Analysis of Law (5th ed. 1998)....................................................8

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic,
    *Empirical Study of Class Actions in Four Federal District Courts: Final Report
    to the Advisory Committee on Civil Rules* (Federal Judicial Center 1996).........................9

In accordance with Federal Rule of Civil Procedure 23(h) and 54(d)(2), Plaintiff states as follows in support of her *Corrected* Motion for Reasonable Attorneys' Fees and Expenses:

## I.    INTRODUCTION

The class action settlement achieved in this case, which provides $110 in cash to claimants who state they received unwanted text messages from Defendant Red Bull North America, Inc. ("Defendant" or "Red Bull"), represents an undeniable victory for the class members—especially when weighed against the factual and legal hurdles faced in the litigation.

Unlike the typical text spam class action filed under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. ("TCPA"), Red Bull has a "direct relationship" with the recipients of the text messages. That is, at some point each of the putative Class Members provided their cell phone numbers to the Defendant for one reason or another, which raises questions regarding Red Bull's ultimate liability. *See Roberts v. Paypal, Inc.*, No. C 12-0622 PJH, 2013 WL 2384242, at *5 (N.D. Cal. May 30, 2013) (holding that the prior provision of a cell phone number to the sender of the text message for any reason constitutes prior express consent to be texted). Such uncertainty has generally resulted in discounts on such cases—where they actually settle, the relief typically offered to the class ranges from under $25 in coupons to $100 in cash[1]—far less than the amounts awarded in TCPA cases where the sender of the message hasn't previously been provided the consumer's phone number directly.

But not here. In this case—and notwithstanding the substantial obstacles that remained in the litigation—the Class isn't being asked to take any discount. Rather, Red Bull has agreed to

---

[1]      *See, e.g., Kazemi v. Payless Shoesource, Inc*., No. CV09-5142 (Dkt. 94) (N.D. Cal. 2012) (providing for a $25 voucher to each class member); *In re Jiffy Lube Int'l, Inc. Text Spam Litig*., No. 3:11-MD-02261-JM-JMA (Dkt. 97) (S.D. Cal. 2013) (providing for a $20 voucher or $15 cash to each class member); *Arthur v. Sallie Mae, Inc*., No. C-10-198JLR (Dkt. 266) (W.D. Wash. 2012) (providing for a $20-$40 cash payment to each class member); *Gutierrez, et al. v. Barclays Group, et al*. No. 10-cv-1012 (Dkt. 58) (S.D. Cal. 2012) (providing for a $100 cash payment to each class member).

pay up to six million dollars ($6,000,000) for class member claims in addition to the costs of

notice and administering the settlement, an incentive award to the Class Representative, and

attorneys' fees awarded by the Court to Class Counsel, if any. Each claimant is entitled to

$110—an amount higher than any other settlement of its kind. Moreover, Red Bull has further

agreed to prospective relief preventing it from sending future text messages without first

obtaining prior express consent from each person called. Accordingly, there can be little doubt

that the Settlement achieves excellent results for the Class Members, notwithstanding unresolved

factual and legal questions that have diminished the value of similar cases.

In light of the substantial relief afforded under the Settlement, the Court should have little

difficulty approving Class Counsel's request for reasonable attorneys fees. Class Counsel here

has not only worked hard, they've put the interests of the Class first. Refusing to let attorneys'

fees stand in the way of such a strong deal for the class, Miller and Class Counsel agreed to settle

the case without any agreement or certainty regarding attorneys' fees, except—as the Class

Notice provided—that Class Counsel would not seek more than $2,000,000 (or 33.3% of the

fund) in fees and costs.

In any event, on the day the fee petition was due to be filed, the Parties reached an

agreement with respect to reasonable attorneys' fees. Red Bull has agreed not to object to (and

Class Counsel has in turn agreed not to seek more than) an award of attorneys' fees and expenses

in the amount of $1,275,000. This amount is demonstrably reasonable. When calculated as a

percentage of the fund made available to the Class (just over 20%), the amount requested falls

well below the market rate of 30-33%—which the Seventh Circuit has said is more or less the

benchmark in common fund cases. The amount is further supported by the representation

agreement between Plaintiff and Class Counsel, the risk of non-payment, the quality and quantity

2

of the work performed, and the likelihood of success. And, such an award is consistent with the fees sought and awarded in similar cases. Accordingly, the Court should have little difficulty affirming their reasonableness and awarding them accordingly.

## II.      BACKGROUND

### A.      Litigation and Mediation

Plaintiff has already provided the Court with an overview of the procedural history of this case, including the Parties' several mediations with the Honorable Wayne R. Andersen (ret.) in Plaintiff's Motion for Preliminary Approval. (Dkt. 44.) Thus, Plaintiff will briefly summarize the procedural history of the case as it pertains to the instant Motion.

Plaintiff Miller filed her complaint on June 21, 2012, alleging that she received unauthorized text message advertisements promoting Red Bull's products and services in violation of the TCPA. (Dkt. 1.) Along with her complaint, Miller filed a motion for class certification, but only to avoid an involuntary "pick off" and the mooting of her claim. Plaintiff's certification motion requested that the court reserve its ruling on the certification issue until the Parties had a chance to conduct discovery into the relevant issues. (Dkt. 4.) Recognizing the issue of certification was not ripe for determination, the Court denied the motion without prejudice. Red Bull eventually answered the complaint, denying the substance of the allegations and setting forth numerous affirmative defenses. (Dkt. 29.) Shortly after Red Bull answered, however, Plaintiff moved to strike certain affirmative defenses on the basis that they were legally insufficient. The Court granted Plaintiff's motion and Red Bull ultimately amended its answer and affirmative defenses.

Following their Rule 26(f) conference, the Parties exchanged initial disclosures, and Plaintiff propounded discovery on Red Bull and other third parties. (See Declaration of Jay

Edelson ["Edelson Decl."] ¶ 9, a true and accurate copy of which is attached as Exhibit 1.) It was at this stage that the Parties began discussing whether it made sense to engage in mediation in an attempt to resolve the case in its early stages. (*Id*.) In the weeks leading up to mediation, the Parties exchanged certain documents and other information that would be needed to effectively engage in the mediation process. (*Id*.)

On November 6-7, 2012, the Parties met for a formal mediation with former District Judge Wayne Andersen. (Edelson Decl. ¶ 10.) After two days of mediation, additional exchanges of information, and several rounds of arm's-length negotiations—all with the assistance of Judge Andersen—the Parties made a great deal of progress toward a classwide settlement, but were still unable to come to terms. As certain issues remained unresolved, they agreed to continue talking, but did not commit to any further mediation sessions. (*Id*.)

Negotiations continued on, however, and after several additional rounds (all at arm's-length presided over by Judge Andersen) that took place over the course of the next two months, and having made substantial progress toward a classwide settlement, the Parties agreed to another in-person mediation session, which took place on January 10, 2013. (Edelson Decl. ¶ 11.) Although the Parties were able to agree on the principal terms of class relief at that time, they reached an impasse on certain remaining issues. (*Id*.)

As such, Judge Andersen convened a final mediation session on February 25, 2013. (*Id*. ¶ 12.) With Judge Andersen's assistance, the Parties were able to resolve all remaining issues. Notably, however, the Parties did not agree on, much less discuss, any amount of attorneys' fees payable to Class Counsel. (*Id*.) Rather, Class Counsel—determined to not delay the relief to the Class with continued negotiations over attorneys' fees, which were bound to be long and drawn out—agreed to simply file a fee petition with the Court and committed to not seek more than

$2,000,000 in attorneys' fees and costs. (*Id*.)

It was not until June 13, 2013—the deadline for Class Counsel to file their fee petition—that the Parties were finally able to agree on the amount of fees and costs to be paid to Class Counsel under the Settlement. (Edelson Decl. ¶13.) Again, with the assistance of Judge Andersen, and this time through separate telephone conferences, the Parties reached a deal on fees and costs in the amount of $1,275,000, subject to Court approval. (*Id*.)

**B.      Settlement Terms**

The Settlement reached between the Parties calls for Red Bull to pay up to $6,000,000 to fund the settlement, which will pay for Class Member claims, as well as the costs of notice and administering the Settlement, the incentive award to the Class Representative, and attorneys' fees to Class Counsel. (Settlement ¶¶ 1.36, 2.1.) Class Members are able to submit claims by U.S. Mail or online at the Settlement Website, www.millertexsettlement.com. (*Id*. ¶¶ 1.36, 4.1, 8.1, 8.2.)

The Settlement also provides for a multi-part Notice Plan that includes direct notice by mail and e-mail, publication notice, a dedicated settlement website, and notice to the relevant government agencies under the Class Action Fairness Act, 28 U.S.C. § 1715. (Settlement ¶ 4.2.) Red Bull provided the Settlement Administrator with a Class List containing the cell phone numbers of each person to which it sent an allegedly unauthorized text message. (*Id*. ¶ 4.2(a).) The Settlement Administrator was then directed to send direct mail and e-mail notice to all addresses obtained through a "Reverse Telephone Lookup" of the Class List. (*Id*. ¶ 4.2(c).) As a supplemental means of notice, the Settlement Administrator published the "long form" notice of the Settlement in both *People* and *Game Informer* magazines, and posted it on the Settlement Website. (*Id*. ¶ 4.2(d), (e).)

Further, the Settlement provides prospective relief by requiring Red Bull to comply with the TCPA and refrain from sending future text message advertisements to consumers without their prior express consent to be contacted. (Settlement ¶ 2.2.) In addition to this prospective relief, the claim form allows Class Members to specifically request that their phone numbers be removed from Red Bull's databases. (*Id*. ¶ 2.3.)

## III.  ARGUMENT

### A.  Class Counsel's Attorneys' Fees and Expenses Should Be Approved Because They Are In Line With the Market Rate.

In common fund cases like the instant settlement, the Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007); *see also Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) ("When attorney's fees are deducted from class damages, the district court must try to assign fees that mimic a hypothetical *ex ante* bargain between the class and its attorneys."). The probability of success at the outset of the litigation is relevant to this inquiry. *See Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994).

In order to determine the applicable market and corresponding market rate for attorneys' fees, courts look at three factors: "[1] actual fee contracts that were privately negotiated for similar litigation, [2] information from other similar cases, and [3] data from class-counsel auctions." *Taubenfeld v. AON Corp*., 415 F.3d 597, 599 (7th Cir. 2005) (citing *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722-23 (7th Cir. 2001)). Further, the Seventh Circuit has held that "the market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Synthroid*, 264 F.3d at 721. For "the object in

6

awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992); *see also Sutton*, 504 F.3d at 693 (directing district court on remand to consult the market for legal services so as to arrive at a reasonable percentage that reflects the going market rate for comparable services). Taking all of these factors into account demonstrates that the requested fees are actually well below the market rate. (Declaration of Adam J. Levitt ["Levitt Decl."] ¶¶ 13-14, 16-19, a true and accurate copy of which is attached as Exhibit 2.)[2]

### 1.    Attorneys' Fees Should be Calculated By the Percentage-of-the-Fund Method.

In awarding fees in class actions, the law affords district courts with discretion to apply either the percentage of the fund method or the "lodestar" method, *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994), but "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred upon the class." *Williams v. Gen. Elec. Capital Auto Lease*, 1995 WL 765266, *9 (N.D. Ill. Dec. 26, 1995); *see Sutton*, 504 F.3d at 692 (the common fund benefit approach "is based on the equitable notion that those who have benefited from litigation should share in its costs") (internal quotations omitted). This is especially true where the percentage accurately reflects the market. (*Id.*) To determine which is the appropriate method to use in a given case, courts must look to the prevailing method for compensating counsel in similar cases. *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 814-15 (E.D. Wis. 2009); *Assess. Tech. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434, 438 (7th Cir. 2004) ("The best evidence of the value of the lawyer's services is what the client agreed

---

[2]        The Levitt Declaration was finalized and executed before the Parties were able to reach an agreement on attorneys' fees. Thus, it refers to Class Counsel's anticipated $2,000,0000 fee request (i.e., 33%), rather than the recently agreed-upon $1,275,000 (i.e., 21%).

to pay him"); *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000) ("the measure of what is reasonable [as an attorney fee] is what an attorney would receive from a paying client in a similar case"). And "[w]hen the prevailing method of compensating lawyers for similar services is the contingent fee, then the contingent fee *is* the 'market rate.'" *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 2006).

### 2.    The Market Rate in Similar Cases is 30-33% And Thus Class Counsel's 21% Fee Request Is Reasonable.

In this Circuit, courts typically award attorneys' fees "equal to one third or more of the recovery[3] [for the class]." *Teamsters Local Union No. 604 v. Inter-Rail Transport, Inc.*, 02-cv-1109 DRH, 2004 WL 768658, at *1 (S.D. Ill. Mar. 19, 2004); *see also In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1033 (30% is the "benchmark for an award of fees in class actions."); *Gaskill v. Gordon*, 160 F.3d 361, 362-363 (7th Cir. 1998) (awarding lead counsel 30% of a $7.25 million fund and stating that "the typical contingent fee is between 33 and 40 percent"); *Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560, 597–600 (N.D. Ill. 2011) ("A number of fee awards in common-fund cases from within the Seventh Circuit show that an award of 33.3% of the settlement fund is within the reasonable range"); *Meyenburg v. Exxon Mobil Corp.*, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("The Court is independently aware that 33

---

[3]    Additionally, although the deadline for class members to file claims is September 25, 2013 the Court need not wait until that time to determine attorneys' fees, as the calculation of fees in class actions like this one where a common fund has been created is based on a percentage of the total benefits conferred under the settlement, not the amount claimed against it. *See Boeing*, 444 U.S. at 480; 2 NEWBERG ON CLASS ACTIONS § 1.18 (3d Ed.1992) ("[I]t is now settled that class counsel may seek a fee award based on the total potential benefit to the class, rather than being limited by the total amount of claims actually exercised by class members."); *see also McKinnie*, 678 F. Supp. 2d at 815 (awarding attorneys' fees based on $2.1 million fund made available to the class "regardless of the fact that a small number of class members actually filed claims" and where amounts remaining reverted to defendant) (collecting cases). Payment of fees based on the total amount available to the class also helps achieve the deterrence function of class actions. *See* Richard A. Posner, Economic Analysis of Law 626-27 (5th ed. 1998) ("[T]he most important point from an economic standpoint is that the violator be confronted with the costs of his violation-this achieves the allocative purpose of the suit-not that he pays them to his victims.")

1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation.").[4]

Likewise, the award of attorneys' fees in other TCPA class actions is consistently between 25-33% of the total fund available, as indicated by the chart attached as Exhibit 3. *See* Levitt Decl. ¶¶ 13-14; *see also CE Design Ltd. v. Cy's Crab House North, Inc.*, No. 07-cv-5456 (N.D. Ill. 2007) (TCPA litigation awarding 33 1/3% of $3.65 million fund); *Hinman v. M and M Rental Center, Inc.*, No. 1:06-cv-01156 (N.D. Ill. 2006) (TCPA litigation awarding 33 1/3% of 5.82 million fund); *Lozano v. Twentieth Century Fox*, No. 09-cv-6344 (N.D. Ill. 2011) (TCPA litigation awarding 25% of $16 million fund to class counsel); *Espinal v. Burger King Corp. et al*, No. 09-cv-20982 (S.D. Fla. 2009) (TCPA litigation awarding Class Counsel 33.3% of the settlement fund).

Here, the fee request of $1,275,000 amounts to 21% of the $6,000,000 payable under the Settlement. Thus, the requested fees fall well below the 33% market rate for TCPA class actions.

### 3. The Fee Agreement Between Plaintiff and Class Counsel Support the Requested Attorneys' Fees.

Awarding fees based on a percentage of the overall fund made available to the Class is supported by the Plaintiff's fee agreement with Class Counsel (a true and accurate copy of which is attached to the Edelson Declaration as Exhibit 1-B). The fee agreement between Class Counsel and Plaintiff contains a contingency fee arrangement whereby Plaintiff agreed that a "fair award of attorneys' fees from a fund recovered for the class would be one-third of the total recovery plus reimbursement of all costs." (*See* Ex. 1-B.) As such, fees in this case may be properly

---

[4]     These figures are also in accord with a Federal Judicial Center Study that found that in federal class actions, median attorney fee awards nationally were in the range of 27% to 30%. Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules*, at 69 (Federal Judicial Center 1996).

determined as a percentage of the $6,000,000 made available to fund the settlement. *See Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (awarding attorneys' fees in the amount of 33 1/3 % of the common created "[b]ased on the actual contingency fee agreements [p]laintiffs' counsel signed" and "market data for fees" in similar cases.) And here, calculating fees based on a percentage of the overall fund actually yields an amount that falls well within the prevailing market rate for comparable work, making Class Counsel's fee request reasonable.

### 4. *The Risk of Nonpayment and Not Prevailing, Coupled with the Quality and Amount of Work, Adds Further Support to the Requested Fees.*

From the outset, this case has been fraught with risk, both from the standpoint of nonpayment and also of not prevailing on the claims. With respect to nonpayment, in any case brought as a class action, there is risk that the attorneys representing the putative class will not be compensated for the work they put into the case. (Levitt Decl. ¶ 18.) The Seventh Circuit has recognized "that there is generally some degree of risk that attorneys will receive no fee (or at least not the fee that reflects their efforts) when representing a class because their fee is linked to the success of the suit." *Sutton*, 504 F.3d at 694 (citing *In re Cont'l Ill. Sec. Litig.*, 962 F.2d at 569-70).

Here, even from the start of their investigation into this case, Class Counsel was aware that it would spend hundreds of hours of attorney time in contested litigation with no guarantee of success. Class Counsel has in fact expended over 877 hours representing the Plaintiff and the Class without compensation, which does not even take into account the work that must still be performed before the final fairness hearing, including further briefing, communicating with Class Members, and supervising the administration of the Settlement. While Class Counsel have been successful with several TCPA text-message cases, the fact is that there is an inherent risk associated with any litigation, and occasionally, certain cases fail to realize any return on

investment of time or out-of-pocket expenses.

Class Counsel was also acutely aware of the risks associated with the possibility that Red Bull would prevail on its "direct relationship" argument—i.e., that each Class Member consented to receive future text messages when they voluntarily provided Red Bull with their cell phone numbers. *See Roberts,* 2013 WL 2384242, at *5. Further, Class Counsel's fronting of attorney time and the costs of litigation in this case on a fully contingent basis was especially risky—although the Ninth Circuit and judges in this District have concluded that the TCPA applies to text messages, the issue has yet to be presented to the Seventh Circuit. Equally untested is whether the type of equipment used to transmit *en masse* text messages falls within the TCPA's statutory definition of "automatic telephone dialing system." (Edelson Decl. ¶ 19.) Given these obstacles, obtaining a sizable victory at trial or on summary judgment was anything but certain, especially when litigating against a well-financed defendant employing top-tier counsel.

Despite these obstacles, Class Counsel was able to negotiate an incredibly strong Settlement for the benefit of the Class. The relief offered under the Settlement is in line with scores of other TCPA deals, which have all met the widespread approval of state and federal courts across the country.[5] In the end, taking into account the inherent risks attendant with class actions and the quality and amount of work performed, the Court should have little concern about whether the requested fee represents the market rate. It absolutely does.

### B. The Lodestar Approach Confirms the Reasonableness of a $1.275 Million Award.

While most courts in this Circuit have questioned[6] the use of the lodestar analysis either

---

[5]     *See, e.g., Satterfield v. Simon & Schuster, Inc.,* No. 06-cv-2893-CW (Dkt. 132) (N.D. Cal. Aug. 8, 2010); *Rojas v. Career Educ. Corp.,* No. 10-cv-5260 (N.D. Ill. 2012); *Lozano,* No. 09-cv-6344; *Kramer v. Autobytel, Inc.,* No. 10-cv-2722 (Dkt. 148) (N.D. Cal. Jan 27, 2012).

[6]     In the Seventh Circuit the use of a lodestar cross-check is not required. *Williams,* 658 F.3d at 636

for determining the proper amount of fees or as a "cross-check," the attorneys' fee award that

Class Counsel seeks is equally reasonable under the lodestar method. *See Schulte*, 805 F. Supp.

2d at 598; *see also In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F.Supp.2d

1028, 1037-38 (N.D. Ill. 2011) ("It is not a requisite of reasonable attorneys' fees that Class

Counsel engage in laborious litigation over many years. Instead, it is a question of what the Class

Members and Counsel would have agreed to *ex ante* in arm's length negotiation."). As such,

should the Court desire to perform such analysis, the lodestar approach would certainly confirm

the reasonableness of the fees and award requested here.

To determine the reasonableness of attorneys' fees under the lodestar method, the first

step is to "multiply[] a reasonable hourly rate by the number of hours reasonably expended."

*Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010). A reasonable hourly rate should be in

line with the prevailing rate in the "community for similar services by lawyers of reasonably

comparable skill, experience and reputation." *Jeffboat, LLC v. Director, Office of Workers'*

*Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919,

930 (7th Cir. 2003) (finding the attorney's actual billing rate for comparable work to be

presumptively appropriate). Once calculated, the Court must adjust that total by the use of a

multiplier, which accounts for the risk of loss Class Counsel faced when embarking on the

litigation. *In re Trans Union Corp. Privacy Litig.*, 629 F.3d at 746.

Class Counsel's lodestar in the instant case is reflected in the following chart:

---

("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive."); *see also Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach."); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388, at *4 (N.D. Ill. May 7, 2012) (recognizing that "there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration and holding that it "is unnecessary to resort to a lodestar calculation to reinforce the same conclusion").

| ATTORNEY (Position) | YEARS OF PRACTICE | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Jay Edelson (Managing Partner) | 16 | 114.7 | $675.00 | $77,422.50 |
| Rafey S. Balabanian (Partner) | 7 | 96.1 | $550.00 | $52,855.00 |
| Ari J. Scharg (Associate) | 4 | 308.5 | $425.00 | $131,112.50 |
| Eve-Lynn Rapp (Associate) | 3 | 80.8 | $390.00 | $31,512.00 |
| Megan Lindsey (Associate) | 1 | 57.1 | $335.00 | $19,128.50 |
| Amir Missaghi (Incoming Associate) | N/A | 220.0 | $215.00 | $47,300.00 |
| Estimated Time Remaining | | | | $80,000.00 |
| **TOTAL** | | | | **$439,330.50** |

(Edelson Decl. ¶ 22.) Class Counsel has also fronted $16,480.02 in litigation costs. (*Id*. ¶ 24.)

Class Counsel's base lodestar of $439,330.50 represents the total work that the attorneys at Edelson LLC have undertaken (and will yet undertake) since the start of this class action lawsuit. The attorney rates listed are the same as those charged to hourly clients, *see Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 407 (7th Cir.1999) (where the base lodestar is reflective of the rates charged to hourly-paying clients, there is a presumption of reasonableness), and are comparable to (or less than) those charged by attorneys in Chicago with similar background or experience. (Edelson Decl. ¶ 21.) Moreover, these rates have been approved as reasonable by several judges in this District, as well as in other federal courts throughout the country, in both TCPA cases and other class action litigation. (*Id*.)

The base lodestar, however, is not the end of the inquiry. Whether the fee award is based on lodestar or a percentage-of-the-settlement fund, the final factor weighed in determining the reasonableness of the fee award is the risk of loss that Class Counsel faced when embarking on the litigation. *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 746 (7th Cir. 2011); *see also Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991) ("the judge should view the

multiplier from an *ex ante* perspective; that is, what size risk the attorney assumed at the outset by taking this type of case") (citing *Skelton v. General Motors* Corp., 860 F.2d 250, 258 (7th Cir. 1988)); Richard Posner, Economic Analysis of Law § 21.9, at 534-35 (3d ed. 1986) (explaining it is established practice to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases). Deciding an appropriate multiplier in the lodestar context also requires the Court to consider "the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation." *Gastineau*, 592 F.3d at 748.

Here, the requested award would represent a multiplier of just 2.9. This is consistent with—and in fact well below—multipliers typically used in this District and across the nation. *See Harman*, 945 F.2d at 976 (acknowledging that "[m]ultipliers anywhere between one and four, have been approved").[7] Further, Class Counsel's willingness to undertake this litigation was risky (Edelson Decl. ¶¶ 18-19), and despite such risk, counsel was able to achieve an exceptional result for the Class—especially when compared with other TCPA settlements where the parties had a direct relationship. *See*, *supra*, fn 1. And, the fact that this case reached an early settlement is not a basis for denying a risk multiplier. *Skelton*, 860 F.2d at 257-58. Instead, it should be seen as a testament to Class Counsel's abilities.

### C.    The Incentive Award Is Reasonable and Should Be Approved

Miller's negotiated incentive award of $5,000 for serving as the Class Representative

---

[7]    While typical multipliers awarded in comparable class action litigation average 4, they are often much higher. *See, e.g., Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-4578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (approving lodestar multiplier of 15.6); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. Apr. 8, 2005) (approving lodestar multiplier of 4.7); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736, n.44 (E.D. Pa. 2001) (finding fee award equivalent to 4.5 to 8.5 multiplier "unquestionably reasonable"); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (approving lodestar multiplier of 5.5); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 135 (D.N.J. 2002) (approving lodestar multiplier of 4.3).

warrants approval as well. Because a plaintiff is essential to any class action, "[i]ncentive awards are justified when necessary to induce individuals to become named representatives." *In re Synthroid Mktg. Litig.*, 264 F.3d at 722-23. In deciding whether an incentive award is warranted, courts look to: (1) "the actions the plaintiff has taken to protect the interests of the class"; (2) "the degree to which the class has benefitted from those actions"; and (3) "the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016. Each of these factors supports granting the Class Representative's requested award.

Here, the proposed incentive award for Ms. Miller is entirely reasonable in that her involvement in this litigation was critical to the ultimate success of this case. (Edelson Decl. ¶ 26.) Further, the proposed incentive award of $5,000 is at or below awards approved in similar class action settlements. *See Weinstein v. 12 AIRIT2ME, Inc.*, No. 1:06-cv-00484 (N.D. Ill. 2008) (incentive awards of $10,000 and $5,000 to two plaintiffs); *Lozano,* No. 09-cv-6344 (incentive award of $15,000); *Kramer*, No. 10-cv-2722 (incentive award of $10,000); *Rojas*, No. 10-cv-5260 (incentive award of $30,000 split amongst five plaintiffs).

Throughout this litigation there was no pre-agreement or discussion concerning an award or the potential for an award in exchange for the Ms. Miller's involvement. (Edelson Decl. ¶ 25.) Nonetheless, Ms. Miller contributed her own time and effort in pursuing both her individual claim, as well as the class claims, exhibiting a willingness to participate and undertake the responsibilities and risks attendant with bringing a representative action. (*Id*. ¶ 26.) Showing her commitment to the case early on, Ms. Miller even relinquished control of her cell phone (which received the text messages at issue) so that Class Counsel could create a mirror image of its hard drive and preserve relevant evidence. (*Id*.)

Thus, the requested incentive award of $5,000.00 is reasonable and should be approved.

## VI.    CONCLUSION

For the reasons stated above, Plaintiff Thi Miller and Class Counsel respectfully request

that the Court approve Class Counsel's unopposed request for (i) an award of attorneys' fees and

expenses in the amount of $1,275,000, (ii) an incentive award to the Class Representative in the

amount of $5,000, and (iii) any such further relief the Court deems reasonable and just.

Respectfully submitted,

Dated:  June 14, 2012                          THI MILLER, individually and on behalf of all
                                               others similarly situated

                                               By: /s/ Ari J. Scharg
                                                     *One of Plaintiff's Attorneys*

Jay Edelson
Rafey S. Balabanian
Ari J. Scharg
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
jedelson@edelson.com
rbalabanian@edelson.com
ascharg@edelson.com

*Attorneys for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I, Ari J. Scharg, an attorney, certify that on June 14, 2013, I served the above and foregoing ***Plaintiff's Corrected Unopposed Motion for Approval of Attorneys' Fees, Expenses, and Incentive Award***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.


/s/ Ari J. Scharg